1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 PAUL DAVID CARR, | Case No. 21-cv-0900-MMA (MMP) |
| 12 Petitioner, | **ORDER:** |
| 13 v. | **DENYING AMENDED PETITION** |
| 14 NEIL McDOWELL, Warden, et al., | **FOR WRIT OF HABEAS** |
| 15 Respondents. | **CORPUS; and** |
| 16 | [Doc. No. 30] |
| 17 | |
| 18 | **DECLINING TO ISSUE** |
| 19 | **CERTIFICATE OF** |
| | **APPEALABILITY** |

20
21       Petitioner Paul David Carr ("Petitioner" or "Carr") is a state prisoner proceeding

22  pro se with an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

23  § 2254.  *See* Doc. No. 30.  Carr challenges his conviction for first degree murder in

24  Superior Court case no. SCE364831.  The Court has read and considered the Amended

25  Petition [Doc. No. 30], the Answer and Memorandum of Points and Authorities in

26  Support of the Answer [Doc. Nos. 34, 34-1], the Traverse [Doc. Nos. 45, 45-1], the

27  lodgments and other documents filed in this case, and the legal arguments presented by

28  both parties.  For the reasons discussed below, the Court **DENIES** the Petition and

**DISMISSES** the case with prejudice.  The Court also **DECLINES** to issue a Certificate of Appealability.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Greene v. Henry*, 302 F.3d 1067, 1072 (9th Cir. 2002) ("Under the AEDPA, we are required to 'defer to state court findings of fact unless based on an unreasonable determination of the facts in light of the evidence presented' in the state court proceedings.").  The following facts are taken from the state appellate court opinion.

Carr lived in a cabin located on property owned by the Hodson family from August of 2013 until October of 2016 when the shooting occurred.  Doc. No. 35-17 at 3.  Craig Hodson, the victim, Maria Hodson, his wife, and two of their children, Caylee and Christian, lived in the main house.  *Id.* at 2–3.  At first, Carr had a good relationship with the Hodsons, but over time it deteriorated, especially with respect to Maria.  *Id.* at 3.

In November of 2014, Maria confronted Carr as he was loading firewood into his truck from the family's garage.  *Id.* at 3.  Carr told Maria that Craig had given him permission to do so but because Maria did not know about the arrangement, she asked Carr to wait until Craig returned.  *Id.*  Carr became angry and told Maria to "go to hell." *Id.*  Maria was upset by this incident and Carr was told to stay away from the family home and Maria.  *Id.*  Carr also began to get into confrontations with other tenants on the property and made disparaging and threatening comments about Maria to others.  *Id.* at 4–6.

On October 1, 2016, Carr parked his vehicle in front of a shared dumpster; Maria left a note on the vehicle asking Carr not to park there.  *Id.* at 6.  When Carr saw the note, he grabbed it, crumpled it up, and threw it at Maria's car as she drove away to meet Craig at a local street fair.  *Id.*  About fifteen minutes after Maria arrived at the fair, Carr appeared at the booth Craig and Maria were manning for their church and began to yell at

Craig about Maria's behavior.  *Id.* ag 6–7.  Craig remained calm during the altercation and told Carr he would talk to him about the parking issue when they returned home.  *Id.* Cade Bailey, a former propane customer of Craig's who was at the street fair and observed the interaction between Craig and Carr, testified Craig told him he was going to begin the process of evicting Carr because of his attitude toward Maria and the effect it was having on his marriage.  *Id.* at 7–8.

Between October 2, 2016 and the day of the shooting, Carr wrote several notes and texts to Craig with various complaints and accusations about Craig's and Maria's behavior towards him which he perceived to be harassment.  *Id.* at 9–11.  He also told Craig not to waste any time or money on an eviction because he would be moving out as soon as possible.  *Id.* at 10.  An individual who identified himself as Carr's attorney called the Hodsons on October 4, 2016, and told them Carr was planning to sue them for harassment and property damage to his vehicle by Maria.  *Id.*  Craig gave Carr a 60-day notice to vacate the cabin the next day.  *Id.*  On October 14, 2016, Craig discovered a large scratch on his truck which he and his son Craig II believed was caused by Carr because Carr had been the only individual on the property when the scratch could have occurred.  *Id.* at 12–13.

At about 6:30 p.m. on the day of the shooting, Craig walked to Carr's cabin from the family home to drop off a move-out cleaning list for Carr.  *Id.* at 16.  Shortly after Craig left, Maria and her son Christian, who were in the family home, heard four or five gun shots.  *Id.* at 17.  Maria looked outside and saw Carr walking away from the garage; Christian went to investigate and saw Carr walking away with a handgun and flashlight. *Id.* at 18–19.  According to Christian, he heard Carr say something like, "You're not so tough now" as he walked away.  *Id.* at 19.  Christian found Craig on the ground behind the garage, bleeding and unconscious.  *Id.* at 19–20.  Maria called 911 while Christian performed CPR on Craig, but he was pronounced dead shortly after paramedics arrived. *Id.* at 18.

/ / /

At trial, Carr testified that when he first moved into the Hodson's cabin, he attended the bible study and church run by Craig and Maria, but that as time went on and he became less and less involved in the church, Maria made it clear she did not want him around by harassing him. *Id.* at 23–27. He recounted the incident about the firewood and suggested Maria dented his vehicle when she left the note asking him not to park in front of the dumpster. *Id.* at 26. Regarding the incident at the fair, Carr claimed he asked Craig to speak privately about the parking incident, and when Craig refused to do, Carr became upset and began yelling at Craig. *Id.* at 26.

On the day of the shooting, Carr was sorting through his belongings in preparation for his move. *Id.* at 27. He had a .380 handgun on a TV tray because about a month earlier, he had discovered an unknown man in his yard attempting to steal various items. *Id.* Carr saw the motion detector light on his porch flicker, put the gun in the waistband of his sweatpants, and opened his front door. *Id.* He saw a note on his doorstep which was a move-out cleaning checklist. *Id.* at 27–28. Carr thought the list was incorrect and walked down to the garage where he saw Craig working to discuss the list with him. *Id.* at 28. According to Carr, when he told Craig he had given him the wrong move-out checklist, Craig said "I'm fucking sick of this," grabbed a pole saw from the workbench, and went after Carr with it. *Id.* at 28–29. As Craig advanced on Carr while trying to start the saw, Carr shot Craig in the shoulder in an attempt to stop him. *Id.* at 29. Carr testified he thought the shot had missed because Craig continued to try to start the saw and come towards him. *Id.* Carr then shot Craig two more times in the "beltline." *Id.* Craig continued to wield the pole saw, raising it seven or eight feet above Carr's head, at which point Carr determined he needed to use lethal force to stop Craig and shot Craig again in the chest. *Id.* Craig then dropped the saw and ran out of the garage. *Id.* Carr followed him and saw Craig collapsed on the ground, so he went back to his cabin to call

911.  *Id.*  When police arrived, Carr told them Craig had come at him with a chainsaw.[1] *Id.* at 20.  Because Carr complained he could not breathe and thought he was having a heart attack, he was taken to the hospital.  *Id.*

On February 9, 2017, the San Diego County District Attorney's Office filed an Information charging Carr with one count of murder, a violation of California Penal Code ("Penal Code") § 187(a).  Doc. No. 35-1 at 10–11.  The Information also alleged that Carr personally and intentionally discharged a firearm, within the meaning of Penal Code §§ 12022.53(d), and personally used a firearm, within the meaning of Penal Code § 12022.5(a).  *Id.*  Following a jury trial, Carr was convicted of first degree murder, and the jury found the firearm allegations to be true.  *Id.* at 168.

Carr appealed his conviction and sentence to the California Court of Appeal.  Doc. Nos. 35–14–35-16.  The state appellate court affirmed his convictions but remanded the matter for resentencing in order to allow the sentencing judge to exercise his discretion as to whether the firearm enhancement imposed pursuant to Penal Code § 12022.53(d) should be stricken under a new law that had passed in California.  Doc. No. 35-17.  Carr then filed a petition for review in the California Supreme Court, which issued a summary denial.  Doc. Nos. 35-18–35-19.[2]

Carr filed two Petitions for Writ of Habeas Corpus in the San Diego Superior Court, both of which were denied in written opinions.  Doc. Nos. 35-25–35-28.  He attempted to appeal the denial of his first habeas corpus petition, but the appeal was dismissed as improper.  Doc. Nos. 35-29–35-30.  Carr then filed a Petition for Writ of Habeas Corpus in the California Court of Appeal, which denied it in a written opinion.

---

[1] Carr uses "chainsaw" and "pole saw" interchangeably, but in both instances he is referring to the pole saw police took from the scene of the shooting.

[2] Upon remand, the trial court declined to strike the firearm enhancement, and Carr appealed to the California Court of Appeal.  Doc. Nos. 35-22–35-24.  He did not file a Petition for Review challenging his resentencing in the California Supreme Court.  Because Carr does not challenge his sentence in his federal habeas corpus petition, those proceedings are not relevant to this matter.

1  Doc. Nos. 35-31–35-32.  Finally, he filed a Petition for Writ of Habeas Corpus in the

2  California Supreme Court, which summarily denied the Petition.  Doc. Nos. 35-33–35-

3  34.

4       Carr filed his federal habeas corpus Petition in this Court on May 10, 2021.  Doc.

5  No. 1.  A Motion for Stay was granted on August 8, 2022, Doc. No. 24, and he filed his

6  Amended Petition on March 16, 2023.  Doc. No. 30.  Respondent filed an Answer and

7  Memorandum in Support of the Answer on June 15, 2023, and Carr filed a Traverse on

8  September 20, 2023.  Doc. Nos. 34, 34-1, 45.

9                              **II. ANALYSIS**

10  **A.  Legal Standard**

11       This Petition is governed by the provisions of the Antiterrorism and Effective

12  Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).

13  Under AEDPA, a habeas petition will not be granted with respect to any claim

14  adjudicated on the merits by the state court unless that adjudication: (1) resulted in a

15  decision that was contrary to, or involved an unreasonable application of, clearly

16  established federal law; or (2) resulted in a decision that was based on an unreasonable

17  determination of the facts in light of the evidence presented at the state court proceeding.

18  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  Clearly established federal

19  law, for purposes of § 2254(d), means "the governing principle or principles set forth by

20  the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*,

21  538 U.S. 63, 72 (2003).

22       A federal habeas court may grant relief under the "contrary to" clause if the state

23  court applied a rule different from the governing law set forth in Supreme Court cases, or

24  if it decided a case differently than the Supreme Court on a set of materially

25  indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant

26  relief under the "unreasonable application" clause if the state court correctly identified

27  the governing legal principle from Supreme Court decisions but unreasonably applied

28  those decisions to the facts of a particular case.  *Id*.  In deciding a state prisoner's habeas

petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Andrade*, 538 U.S. at 75 (the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable"). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," the Court must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

**B. Discussion**

Carr raises four broad claims in his Amended Petition. In Ground One he contends his trial and appellate counsel were ineffective. In Ground Two he claims the prosecutor withheld and failed to preserve exculpatory evidence. He argues the prosecutor committed misconduct in Ground Three, and that expert testimony was improperly admitted in Ground Four. Doc. No. 30. Respondent contends Carr is not entitled to relief because the state courts' resolution of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Doc. No. 34-1.

/ / /

/ / /

1.   Ineffective Assistance of Counsel (Ground One)

Carr argues his trial counsel was ineffective in several ways.  He claims counsel was inexperienced and gave him incorrect legal advice, failed to obtain a psychiatric exam, failed to object to certain evidence presented by the prosecutor, coerced him into presenting false testimony, failed to object to misconduct committed by the prosecutor during closing argument, failed to retain a ballistics expert, a crime scene reconstruction expert, and a chain saw expert, failed to file a motion regarding the failure to preserve evidence, and failed to properly investigate and challenge the timing of the 911 calls. Doc. No. 30 at 21–45.  Carr raised these same claims in the habeas corpus petition he filed in the California Supreme Court.  Doc. No. 35-33.  The California Supreme Court summarily denied the petition, and thus this Court must "look through" to the last reasoned state court decision, the California Court of Appeal's opinion, to determine whether the denial of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Ylst*, 501 U.S. at 805–06.  That court wrote:

> Even if we overlook Carr's delay, which he contends was largely caused by restrictions in prison during the pandemic, in filing his writ petition of approximately five years after his conviction, Carr fails to state a prima facie case for relief.  He generally contends his trial counsel was ineffective for multiple reasons.  To establish ineffective assistance of counsel, Carr must demonstrate deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)
>
> Carr fails to establish any deficient performance.  His central claim appears to be that his trial counsel advised him that his theory of self-defense contradicted the physical evidence, which Carr characterizes as his counsel coercing him to change his story to better fit the evidence.  Due to Carr's new story being contradicted by other evidence highlighted by the prosecution at trial, Carr now contends his counsel's advisement was ineffective.  Carr also contends his counsel was ineffective for failing to retain expert witnesses regarding chainsaws and ballistics and for failing to understand the timing of the 911 calls.  He additionally contends the prosecutor made improper arguments in his closing argument, which his counsel failed to challenge.  At best, Carr's claims are speculative and conclusory and fail to demonstrate any deficient performance.

21-cv-0900-MMA (MMP)

However, even if we accept, for purposes of our initial review only, that but for counsel's guidance Carr would have offered slightly different testimony at trial, could have introduced additional expert witness testimony at trial, and his counsel would have made better objections, Carr fails to demonstrate how there is a reasonable probability of a different result at trial. As discussed on direct appeal, there was overwhelming evidence introduced at trial to support his conviction. The jury found Carr not credible and rejected his explanation such that it does not appear likely that any additional evidence would have led to a different result. Thus, even accepting, for purposes of argument, Carr's claims of error, we conclude there is no reasonable probability of a different result. For the same reason, we conclude that Carr's claim that his appellate counsel was ineffective for failing to raise these claims on direct appeal also has no merit.

Doc. No. 35-32 at 2–3.

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 686–87.

A petitioner must also show he was prejudiced by counsel's errors. *Strickland*, 466 U.S. at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). A court must find that the likelihood of a different result is substantial, not just conceivable. *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

A successful *Strickland* claim requires a petitioner to establish both defective performance and prejudice. *Strickland*, 466 U.S. at 694. But if a petitioner does not establish he was prejudiced by any errors committed by counsel, a court need not address

the deficient performance prong of *Strickland*. *Id*. at 697. When evaluating an ineffective assistance claim under § 2254(d)(1), a federal court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "If 'there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard,' we must deny habeas relief." *Demirdjia. Gipson*, 832 F.3d 1060, 1066 (9th Cir. 2016) (quoting *Richter*, 562 U.S. at 105)).

Carr first contends his trial counsel was too inexperienced to handle his case. *See* Doc. No. 30 at 21–25. In support, he claims counsel gave him incorrect legal information about the admissibility of polygraph evidence and hypnotically refreshed testimony, did not get a psychiatric evaluation for Carr, and failed to make proper objections. *Id.* He also argues he was improperly denied substitute counsel and that counsel failed to object to remarks made by the prosecutor during closing argument. *Id.*

Carr claims he asked counsel to arrange for a polygraph test shortly after he was arrested and that counsel incorrectly told him polygraph tests were inadmissible. *See* Doc. No. 30 at 23. California Evidence Code § 351.1 provides that "the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results." Cal. Evid. Code § 351.1. Carr has not established deficient performance because counsel's statement was correct. *Strickland*, 466 U.S. at 688. Further, Carr also has not established he suffered any prejudice from counsel's failure to arrange a polygraph test for him. Carr has not provided any evidence to show the prosecution would have been willing to stipulate to the admission of polygraph evidence, or that the results of a polygraph test would have been helpful to his defense. *Id.* at 697.[3]

---

[3] Carr alleges that California Penal Code § 637.5 ("Penal Code") permits polygraphs to be used for "investigative purposes" and that his attorney did not know or understand this. Doc. No. 30 at 23. Penal Code § 637.5(a) is inapplicable to Carr. It states:

Carr also claims that when he asked counsel to arrange for him to undergo hypnosis to "help verify [his] testimony of the traumatic attack by the deceased," his attorney incorrectly told him that hypnotically refreshed testimony was inadmissible. Doc. No. 30 at 24. California does not categorically exclude testimony that is the result of hypnosis. California Evidence Code § 795 provides that "[t]he testimony of a witness is not inadmissible in a criminal proceeding by reason of the fact that the witness has previously undergone hypnosis for the purpose of recalling events that are the subject of the witness's testimony. . ." if certain conditions are met. Cal. Evid. Code § 795. Even assuming Carr's attorney incorrectly told him testimony that was the result of hypnosis was not admissible under any circumstances, however, Carr has not established there is a substantial likelihood that a different result would have occurred had his attorney arranged for him to undergo hypnosis. *Harrington*, 562 U.S. at 112; *Strickland*, 466 U.S. at 697. He does not explain what additional information would have been gained as a result of using hypnosis, or how that information would have helped his defense. The jury in Carr's case did not find Carr to be credible, as evidenced by fact that they took only an hour to render their guilty verdict. *See* Doc. No. 35-1 at 244–45. It is speculation at best that Carr would have derived any benefit from being subjected to hypnosis or that his testimony would have been deemed more credible by the jury had he been hypnotized. Speculation regarding whether a particular piece of evidence would have helped the defense is insufficient to establish prejudice under *Strickland*. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere

---

> [n]o state or local governmental agency involved in the investigation or prosecution of crimes, or any employee thereof, shall require or request any complaining witness, in a case involving the use of force, violence, duress, menace, or threat of great bodily harm in the commission of any sex offense, to submit to a polygraph examination as a prerequisite to filing an accusatory pleading.

*See* Penal Code § 637.5.

speculation that witness testimony 'might have given information helpful to' the defense.") (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)).

Next, Carr claims counsel told him he was going to have a psychiatric evaluation performed to bolster Carr's testimony but failed to do so, which denied Carr evidence to support his defense. Doc. No. 30 at 24. Carr claims his perception of the events surrounding the shooting, which included a description of feeling as though he was in slow motion, was indicative of "peritraumatic trans disassociation," and that such a diagnosis would have supported his testimony at trial. *Id.* Again, Carr has failed to show he was prejudiced. Carr simply speculates that he would have been diagnosed with "peritraumatic trans disassociation" had he been subjected to a psychiatric evaluation and that the results of any such evaluation would have provided information that would have swayed the jury. That is not sufficient to establish a substantial likelihood that a different result would have occurred had counsel obtained a psychiatric evaluation of Carr. *Harrington*, 562 U.S. at 112; *see also Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) (speculation that psychiatric exam would have shown evidence of a mental illness which would have affected the outcome not sufficient to establish prejudice under *Strickland*).

Carr next faults counsel for making improper objections to the prosecution's introduction of photos of damage to Craig Hodson's truck. Doc. No. 30 at 25. During the hearing on the motions limine, the prosecutor sought to introduce photos and testimony regarding a large scratch that appeared on Craig's truck the morning of the shooting that Maria and Craig Hodson, II believed was caused by Carr. Doc. No. 35-4 at 46–47. Defense counsel argued the evidence should be excluded because there was no foundation for Maria's and Craig II's belief that Carr caused the damage. *Id.* at 48–49. The trial judge allowed the evidence to come in because he thought it was "important what the decedent's response is to a suggestion that it might have been Mr. Carr" and because it would be relevant to whether Craig had the motive or state of mind to attack

Carr.  *Id.*  The trial judge stated, however, that the prosecutor had to make it clear to the jury that there was no direct evidence that Carr had scratched the truck.  *Id.*

At trial, Maria testified that when she asked Craig about the scratch, "[he] said he wasn't really worried about it, we had a good idea it was [Carr] because no one else was home."  Doc. No. 35-6 at 90.  Defense counsel objected on the grounds that Maria's testimony was speculative and lacked foundation.  *Id.*  The trial judge sustained the objection and, on counsel's request, struck the testimony.  *Id.*  The prosecutor then asked Maria, "In your head, who did you think created the damage?" and defense counsel again objected on the grounds that the question called for speculation.  *Id.* at 90–91.  This time, the trial judge overruled the objection, and Maria replied, "I knew that Paul did it, because he was the only one home, and he did not like rules about roaming the yard."  *Id.* at 91.  According to Maria, the scratch "was a very minor thing to [Craig]" and "he wasn't upset," nor did he say anything threatening towards Carr or say he wanted to retaliate.  *Id.*  The prosecutor then asked two follow-up questions which established that neither Maria nor anyone else saw who had damaged the truck.  *Id.*  Later, Craig II also testified about the circumstances surrounding the truck scratch and said he, too, believed Carr had caused the damage to the truck.  Doc. No. 35-7 at 48–53.  He similarly testified that Craig was not upset about the scratch and did not express any desire to hurt or retaliate against Carr.  *Id.* at 52–53.

Carr contends trial counsel should have objected to the truck scratch testimony as "inadmissible bad act evidence and improper lay opinion."  Doc. No. 30 at 25.  Carr has not shown counsel's failure to object on those grounds constituted deficient performance or that he was prejudiced.  *Strickland*, 466 U.S. at 688, 697.  The truck scratch testimony was not "bad act" evidence.  California Evidence Code § 1101 precludes the admission of evidence, including "specific instances of his or her conduct . . . to prove his or conduct on a specified occasion."  Cal. Evid. Code § 1101(a).  But § 1101(b) also provides that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, . . .

21-cv-0900-MMA (MMP)

intent . . .) other than his or her disposition to commit such an act." *Id.* The truck scratch, and Maria's and Craig II's belief that Carr was the cause of the scratch, were relevant to show Carr was angry and hostile toward Craig and that Craig was not upset about the scratch, which rebutted Carr's claim of self-defense.

Further, Maria's and Craig II's testimony was not improper lay opinion testimony. Under California law, "[a] lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony." *People v. Maglaya*, 112 Cal. App. 4th 1604, 1605 (2003) (quoting *People v. Farnam*, 28 Cal. 4th 107, 153 (2002)).  Maria and Craig II testified that in their opinion, Carr caused the damage to Craig's truck because it had not been there the day before and Carr was the only individual, other than a disabled 72-year-old woman, who was on the property the night before the scratch appeared.  Doc. No. 35-6 at 90–91; 35-7 at 48 –53.  Thus, their testimony falls squarely within the parameters of appropriate lay opinion.  Indeed, the appellate court addressed Carr's argument that the evidence was improperly admitted on direct appeal and concluded as follows:

> Finally, even if Craig (and Craig II) believed defendant had scratched the truck, the evidence of Craig's response to the scratch was relevant on the issue of self-defense to show Craig was calm and not hostile toward Carr, as Craig II and Maria both testified.  Such evidence was thus properly admitted to prove a material fact at issue that was unrelated to defendant's alleged bad character or predisposition to criminality (Evid. Code, § 1101, subd. (a)), and was also not improper lay opinion.  (See *People v. Farnam* (2002) 28 Cal.4th 107, 153 [noting a "lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his [or her] testimony"]; see also Evid. Code, § 800 [providing a nonexpert witness may testify in the "form of an opinion" if the opinion is "(a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his [or her] testimony."].)

> Carr nonetheless contends the admission of the truck scratch was prejudicial error because it allowed the jury to infer he was angry at Craig, when in fact the record evidence merely showed he "complained" about Maria.  Carr's contention is frivolous, as it ignores the record in the instant case, which clearly shows – based on his threatening text messages, his

behavior at the street fair about two weeks before the homicide, the notes he tacked to his own door for Craig to read, and his text message to DeAnne minutes before the homicide – that defendant was very angry and upset not only at Maria, but also at Craig, particularly after October 5 when he was served with a 60-day notice to vacate.

Doc. No. 35-17 at 47–48.

Any objection by counsel on grounds that the evidence was improper bad act or lay opinion would have been overruled.  Counsel is not required to make frivolous objections, *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002), and Carr has therefore failed to establish either deficient performance or prejudice.  *Strickland*, 466 U.S. at 688, 697.

Carr next claims the San Diego County Public Defender's Office's refusal to assign him a new attorney violated his Sixth Amendment right to effective counsel.  Doc. No. 30 at 24.  Carr alleges he called the Public Defender's Office and asked trial counsel's supervisor for a different attorney because he believed trial counsel was not providing competent representation; the supervisor refused to do so.  *Id*. at 24–25.  As Carr acknowledges, "an indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."  *Luis v. United States*, 578 U.S. 5, 12 (2016) (citing *Caplin & Drysdale*, 491 U.S. 617, 624 (1989).  The proper procedure in California for challenging the competency of appointed counsel is for a defendant to request a hearing pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970) and ask the court to discharge their appointed attorney and appoint a new one.  There is no evidence in the record that Carr asked for and was denied a *Marsden* hearing, and so Carr has failed to establish a Sixth Amendment violation.

Next, Carr claims trial counsel coerced him into testifying falsely.  Doc. No. 30 at 26–28.  Carr alleges he wrote a statement for his attorney recounting the events surrounding the shooting in which he stated that Craig advanced on him while holding the pole saw with his left arm holding the shaft of the pole saw.  *Id.*  According to Carr, his attorney told him to testify that Craig was holding the pole with his right arm forward.

*Id.*  When Carr objected to testifying in contradiction to his statement, his attorney allegedly said, "Well, that is how it's going to be if you want an attorney at a murder trial."  *Id.*  Carr then testified that Craig was holding the pole saw with his right hand forward.  *Id.*; Doc. No. 35-11 at 158–63.  As a result, Carr was subjected to extremely effective cross-examination by the prosecutor at trial, who questioned how and why Craig, who was right handed, would hold the pole saw in this manner, particularly since he would have had to pull the rip cord to start the saw with his left hand.  Doc. No. 30 at 26–28; Doc. No. 35-11 at 158–63.  Carr claims his statement was lost.  *Id.*  Other than his own self-serving allegations, Carr has provided no evidence to support his claim that his trial attorney coerced him into providing false testimony, and thus his claim fails.  *See Turner*, 281 F.3d at 881 (self-serving statements by a petitioner, by themselves, are not sufficient to establish ineffective assistance of counsel); *Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007).  Carr's claim that the allegedly coerced testimony "infringed upon [his] 5th Amendment right to testify and right against self-incrimination" fails for the same reason.

According to Carr, counsel also failed to object to comments made by the prosecutor during the closing argument which he alleges were improper "character assassination."  Doc. No. 30 at 38–41.  He specifically cites to the following statements by the prosecutor:

"The whole Hodson family deserves justice."

"Craig should be hugging his wife Maria."

"By killing Craig, (Petitioner) robbed the whole family."

"Cade Bailey took a moment to pray."

"Craig had everything to lose . . . had a passion for volunteering as a pastor."

"The defendant chose to 'fire, fire, fire, fire' into Craig Hodson's body."

"This was gut-wrenching stuff, Christian Hodson cradled his dead father."

"The last moment of Craig Hodson's life wasn't spent having ice cream with his 11-year-old daughter Caylee."

"Craig and his 11-year-old daughter Caylee talked about having ice cream later that night.  This was a man that planned on having ice cream with his daughter later that very night."

"Craig Hodson is a person who is about to go have ice cream with his daughter."

Doc. No. 30 at 39.

Counsel's failure to object to these statement did not constitute deficient performance because none of the statements listed by Carr were objectionable. *Strickland*, 466 U.S. at 688.  The prosecutor's comments were well within the appropriate bounds of closing argument because they consisted of nothing more than comments on testimony provided at trial or reasonable inferences that could be derived from that testimony.  *See Shaw v. Terhune*, 380 F.3d 473, 480 (9th Cir. 2004) (stating that "it is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor in good faith might be true").  The testimony at trial established that Craig was a pastor who was loved by his family and friends, that he was slow to anger, and that Maria and Christian heard four to five shots just before Christian found his mortally wounded father who he cared for until the paramedics arrived.  Doc. No. 35-6 at 47, 99, 157, 165–67, 35-7 at 69.  Maria testified that Craig and their daughter Caylee had "a ritual of having ice cream every night and watching the Andy Griffith show," and that they planned to do that after Craig returned from dropping the note off at Carr's cabin.  Doc. No. 35-6 at 96–97.  Cade Bailey testified he prayed with Craig after the incident with Carr at the fair.  Doc. No. 35-7 at 69. Because the prosecutor's comments were not objectionable, and therefore there is not a "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Carr has also not established he was prejudiced by counsel's failure to object.  *Strickland*, 466 U.S. at 694, 697

Carr also alleges trial counsel failed to adequately investigate his case.  Doc. No. 30 at 29–42.  Specifically, he claims counsel should have secured and presented a

chainsaw expert, a ballistics expert, and a crime scene reconstructionist.  In addition, Carr claims counsel failed to properly investigate and present the timeline for the 911 calls, failed to effectively cross-examine expert witnesses for the prosecution, failed to investigate the proper operation of the pole saw, and failed to file a motion regarding a privacy screen containing a possible bullet hole that was thrown away by the Hodsons. *Id.*

The Pole Saw Evidence and Chain Saw Expert

In order to demonstrate how to start the pole saw, to confirm the pole saw worked, to record the sound of the pole saw to determine whether it could be heard from the house by Maria and Christian the night of the shooting, and to cast doubt on Carr's description of the events leading up to the shooting, the prosecution presented several videos of Flavio Alfaro, a property and evidence custodian at the San Diego Sheriff's Department, trying to start the pole saw.  Doc. No. 35-8 at 130–32, 150–53.  *Id.*  Alfaro testified that it "took us a little while" to start the pole saw, and while he had never started that specific pole saw before, he had previously started a chain saw "a couple of times."  *Id.* at 151–52.  Evidence technician Dori Racicot testified it took four attempts to start the pole saw.  Doc. No. 35-8 at 130–32.  Carr claims this evidence "duped [the jury] into believing the pole saw was defective," which in turn impeached Carr's credibility.  Doc. No. 30 at 32.  He faults counsel for failing to secure a "chainsaw expert," failing to investigate and understand how the pole saw worked, including the need to prime the engine before starting it, and failing to effectively cross-examine Alfaro.  *Id.* at 32–33.

Carr has not established deficient performance under *Strickland*.  While counsel has a duty to investigate possible defenses, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."  *Strickland*, 466 U.S. at 690; *see also Dunn v. Reeves*, 594 U.S. 731, 739 (2021) ("[S]trategic decisions—including whether to hire an expert—are entitled to a "strong presumption" of reasonableness.") (quoting *Richter*, 562 U.S. at 104).  Evidence in the record shows counsel did contact a chainsaw expert but decided

not to use him because "the issue was not whether the pole saw would be considered by the jury to be a deadly weapon, but rather whether Mr. Hodson was using the pole saw as a weapon [and] [a]n expert would provide nothing to the jury for that argument." Doc. No. 35-31 at 54.

Carr has also not established prejudice because he does not explain what a chainsaw expert would have testified to, how that testimony would have helped his defense, and how the result of the trial would have been different had a chainsaw expert testified. *Strickland*, 466 U.S. at 697; *see Edwards v. Miller*, 756 Fed. Appx. 680, 681 (9th Cir. 2018) (citing *Grigsby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculation about what an expert could have said is not enough to establish prejudice)). Carr focuses on counsel's lack of knowledge regarding the "importance of proper[ly] gas priming" the pole saw in order to start it and counsel's subsequent failure to attack Alfaro's testimony and the video on those grounds. Doc. No. 30 at 31. But Carr himself testified the entire interaction between him and Craig took "three or four seconds." Doc. No. 35-11 at 172–73. This would not have been enough time for Craig to prime the pole saw before starting it, and so any evidence that established the pole saw could not be started without priming it first would not have helped Carr's defense. In any event, Carr never contended that Craig actually started the pole saw and in fact he testified he shot Craig in part because he was worried Craig would be able to get the pole saw started and "disembowel" him. *See id.* at 186. As defense counsel noted in his letter to Carr, the central question before the jury was not whether the pole saw would be considered a deadly weapon only if Craig had started it. Doc. 35-31 at 54. Rather, the central question was Carr's credibility; a chainsaw expert would not have aided Carr.

<u>Ballistics Expert, Crime Scene Reconstructionist, and Lost Privacy Screen</u>

Carr contends counsel should have hired a ballistics expert and a crime scene reconstructionist. Doc. No. 30 at 33–35. He claims both types of experts, in conjunction with the lost privacy screen which he alleges had a bullet hole in it, would have bolstered his testimony and supported his claim of self-defense. *Id*.

Karen Bloch, a San Diego Sheriff's homicide detective, searched the garage on the night of the shooting and accompanied Field Evidence Technician Raciot as she took photographs inside the garage.  Doc. No. 35-9 at 15–19.  Crime scene reconstructionist Stephen Lu was also present documenting blood patterns.  *Id.* at 16.  They finished the initial search at about 8:45 a.m. the morning following the shooting and Bloch believed she had collected all of the evidence that was available at the scene.  *Id.* at 21.  Bloch later determined that she needed to collect more evidence, however, and she returned to the scene eight days later.  *Id.* at 27.  When she arrived at the garage, she noticed many items had been moved since the shooting.  *Id.* at 28.  She also noticed a mark she thought may have been made by a bullet to the right of a white door hanging in a door frame; the door had not been hung in the frame on the night of the original search.  *Id.*  Bloch then went back through photographs she had taken of the scene on the night of the shooting because she recalled seeing a white privacy screen that had been at the back of the garage which was no longer there.  *Id.* at 29.  Bloch zoomed in on the screen and saw what she thought was a bullet hole in the screen, but when she asked Christian and Maria about the screen, Christian told her he had thrown it away because it had a bullet hole in it.  *Id.* at 29–30.  Bloch had not secured the crime scene when she left the night of the shooting.  *Id.* at 55–62.

Carr has not explained what further evidence would have been presented to the jury had his attorney retained a ballistics expert and crime scene reconstructionist.  Carr's counsel thoroughly cross-examined the prosecution's crime scene reconstructionist and was able to elicit testimony which cast some doubt on Lu's theories regarding the direction of the blood spatter and drip trail evidence which was helpful to Carr's version of events.  Doc. 35-8 at 197–99.  Carr does not provide any declarations or other evidence explaining what further testimony a ballistics expert and a crime scene reconstructionist would have provided that would have helped his defense.  He only speculates that such experts would have provided helpful testimony.  But that is not sufficient to establish either deficient performance or prejudice under *Strickland*.  *See*

*Gallegos v. Ryan*, 820 F.3d 1013, 1035 (9th Cir. 2016) (finding petitioner's speculation that more consultation with an expert would have helped his defense insufficient to establish prejudice under *Strickland*); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (stating that petitioner's failure to offer evidence that an arson expert would have testified on his behalf at trial is insufficient to establish prejudice).

Carr also claims counsel should have filed a motion alleging the prosecutor withheld or failed to preserve exculpatory evidence because police did not collect the privacy screen with a possible bullet hole from the crime scene.  Doc. No. 30 at 42.  Carr claims the lost privacy screen was exculpatory because it would have showed the downward trajectory of one of Carr's shots, establishing he shot Craig in an attempt to disable him, and supported his self-defense claim.  Doc. No. 30 at 33–35.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that a prosecutor must disclose all material evidence, including impeachment evidence, to the defendant.  *Brady*, 373 U.S. at 87.  A successful *Brady* claim requires a defendant or petitioner to show: (1) the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the withheld evidence was either exculpatory or impeachment; and (3) the evidence was material to the defense. *See also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Benn v. Lambert*, 283 F.3d 1040, 1052–53 (9th Cir. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985) and *United States v. Agurs*, 427 U.S. 97, 110 (1976).)  In *California v. Trombetta*, the Supreme Court held that law enforcement has a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense."  467 U.S. 479, 488 (1984) (footnote omitted).  "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Id*.  (internal citation omitted).  The Supreme Court in *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988), held that due process "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than

1   that it could have been subjected to tests, the results of which might have exonerated the

2   defendant."  Such a failure to preserve does not violate due process "unless a criminal

3   defendant can show bad faith on the part of the police."  *Id*. at 58.  Because Carr's claim

4   involves the failure to preserve evidence and not the withholding of evidence, it is most

5   properly analyzed under *Trombetta* and *Youngblood*.

6         Counsel could have reasonably determined that bringing a motion pursuant to

7   *Trombetta* or *Youngblood* would have been fruitless because he was unable to establish

8   either that the screen "possess[ed] an exculpatory value that was apparent before the

9   evidence was destroyed," *Trombetta* 467 U.S. at 488, or that law enforcement acted in

10  bad faith when they failed to preserve the scene which resulted in the loss of the privacy

11  screen as evidence.  *Youngblood*, 488 U.S. at 58.  While it may have been apparent to

12  police that the privacy screen had *some* evidentiary value, it was not apparent the screen

13  had *exculpatory* value.  A bullet hole in the screen may have provided some information

14  about the number and trajectory of the bullets fired in the garage, but it did not "possess

15  an exculpatory value" with respect to the central issue in the case – whether Carr shot

16  Craig in self-defense.  Further, nothing in Detective Bloch's testimony suggests she acted

17  in bad faith, as opposed to mere negligence, when she failed to preserve the screen.  In

18  fact, she testified she would have wanted to collect the screen had it been available.  Doc.

19  No. 35-9 at 30.  Carr has not established prejudice for the same reason.  Any motion

20  made pursuant to *Trombetta* or *Youngblood* would not have been granted because Carr

21  could not satisfy the standards set forth in those cases.  *Strickland*, 466 U.S. at 697;

22  *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (counsel is not required to raise

23  frivolous motions, and failure to do so cannot constitute ineffective assistance of

24  counsel).

25  <u>The 911 Calls</u>

26        The prosecution contended Carr waited three minutes after the shooting to call 911

27  and spent that time concocting his false claim of self-defense.  Doc. No. 35-12 at 62–63.

28  Carr claims the prosecutor omitted the first minute of his 911 call in his presentation to

the jury and that counsel did not properly investigate and understand the timeline of the 911 calls. Doc. No. 30 at 35–38. According to Carr, had counsel properly done so, he could have countered the prosecutor's narrative and his attempt to "falsely extend[] the actual time it took for Petitioner to call 911." *Id.*

Carr's version of events is not supported by the record. Maria testified it took her a minute to two minutes to find her phone in order to call 911 after she heard the gunshots. Doc. No. 35-6 at 103. Detective Bloch testified at trial that both Maria's and Carr's 911 calls were first routed to the California Highway Patrol ("CHP") and then transferred to the San Diego Sheriff's Department, and that she obtained the calls to both the CHP and the Sheriff. Doc. No. 35-9 at 22–24. Bloch was able to determine the time the CHP picked up the calls but not when they were transferred to the Sheriff's Department. *Id.* at 25. Maria's call came into the CHP at 7:19 pm and 45 seconds, and Carr's call came into the CHP at 7:22 pm and 45 seconds, establishing there was a three minute gap between them. *Id.* at 25. The prosecutor played Maria's and Carr's calls to both the CHP and the Sheriff's Department for the jury. *Id.* at 23–25. He also provided a transcript of both of those calls to the jury. *See* Doc. No. 35-1 at 94–121. There was no "missing minute" in the transcripts provided to the jury, contrary to Carr's assertion.

Carr's claim that defense counsel did not understand or investigate the timing of the 911 calls and undermined the credibility of his case by stating during his opening argument that Carr's 911 call came in forty-five seconds to a minute after Maria's call also fails. During his opening argument, defense counsel played Carr's 911 call and told the jury the call was forty-five seconds to a minute after the shooting took place. Doc. No. 35-6 at 31. During his closing argument, defense counsel explained his opening statement as follows:

> The consistency shows you what's going on here. Again, with this 911 call, perhaps I wasn't clear during opening statement on the 45 seconds and the three minutes. Here's what's going on with those 911 calls.
>
> Mrs. Hodson calls 911 and Paul's still down by the garage. It isn't until a couple of minutes into this first 911 call that she mentions that she

1  hears shots fired.  The first couple of minutes are to report this trespass, to
2  report that Paul is inside her garage and isn't supposed to be there.

3  They're both calling.  By the time Paul calls into 911 and is reporting
4  that this incident happened, that's at the point where Mrs. Hodson is stating I
   hear shots fired after she has this horrible event where she finds her husband.

5
6  They're both calling at the same time.

7  Doc. No. 35-12 at 98.

8  Carr has not established counsel's performance was deficient.  Contrary to Carr's

9  claim, defense counsel made a reasonable, strategic attempt to counter the prosecution's

10 narrative that Carr had waited three minutes to call for help by drawing the jury's

11 attention to the delay in Maria's report of the shooting to the 911 operator.  *Strickland*,

12 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts

13 relevant to plausible options are virtually unchallengeable"); *Correll v. Ryan*, 539 F.3d

14 938, 947 (9th Cir. 2008) ("A reasonable tactical choice based on an adequate inquiry is

15 immune from attack under *Strickland*.") (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027,

16 1033 (9th Cir. 1997)).

17 Finally, Carr contends "the cumulative effect of counsel's deficient representation

18 resulted in adverse and substantial prejudice to petitioner."  Doc. No. 30 at 42.  "When an

19 attorney has made a series of errors that prevents the proper presentation of a defense, it is

20 appropriate to consider the cumulative impact of the errors in assessing prejudice." *Turner*

21 *v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *see also Boyde v. Brown*, 404 F.3d 1159,

22 1176 (9th Cir. 2005) ("[P]rejudice may result from the cumulative impact of multiple

23 deficiencies.") (internal quotation marks omitted)).  Here, because the Court has found no

24 instances of ineffective assistance of counsel, Carr's claim that the cumulative effect of

25 counsel's errors resulted a violation of his Sixth Amendment right to competent counsel

26 must fail.  *Turner*, 158 F.3d at 457; *Hayes v. Ayers*, 632 F.3d 500, 523-24 (9th Cir. 2011)

27 (stating that "[b]ecause we conclude that no error of constitutional magnitude occurred, no

28 cumulative prejudice is possible").

1    For the foregoing reasons, Carr has not established the state court's denial of his

2  ineffective assistance of counsel claims was contrary to, or an unreasonable application

3  of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it based on an

4  unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  He is therefore not

5  entitled to relief as to those claims.

6        2.  Ineffective Assistance of Appellate Counsel (Subclaim to Ground One)

7        Carr separately claims in Ground One that his appellate counsel was ineffective

8  because she failed to raise proper challenges to the truck scratch evidence and a pole saw

9  video.  Doc. No. 30 at 25, 31, 42.  Specifically, Carr contends appellate counsel failed to

10  cite sufficient authority to support her argument that the truck scratch evidence should

11  have been excluded as improper lay opinion and "bad act" evidence and should have

12  challenged the admission of the pole saw video by noting Alfaro's lack of knowledge

13  about the need to prime the pole saw and his lack of experience with chainsaws.  *Id.* at

14  31–32.  Carr raised these claims in the habeas corpus petition he filed in the California

15  Court of Appeal.  Doc. No. 35-31 at 37, 48.  The state appellate court concluded that

16  because Carr had failed to establish trial counsel was ineffective, his claims that appellate

17  counsel was ineffective for failing to raise those claims also failed.  Doc. No. 35-32 at 3.

18        Ineffective assistance of appellate counsel claims are subject to the standard of

19  review announced in *Strickland*.  In the context of appellate counsel, a petitioner must

20  show that "counsel unreasonably failed to discover nonfrivolous issues and to file a

21  merits brief raising them," and show "a reasonable probability that, but for his counsel's

22  unreasonable failure . . . , he would have prevailed on his appeal." *Smith v. Robbins*, 528

23  U.S. 259, 285–86 (2000); *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).

24        As discussed above, the California Court of Appeal addressed Carr's claim that the

25  truck scratch evidence was improperly admitted as "bad act" and lay opinion testimony

26  despite the fact that they found the arguments were waived on appeal.  Doc. No. 35-17 at

27  45–49; *see* Section IV(B)(1) at p. 14 of this Order).  Carr suffered no prejudice from any

28  failure of appellate counsel to cite additional authority to support those claims.  *Smith*,

528 U.S. at 285–86.  As to Carr's claim regarding the admission of the pole saw video, counsel argued on appeal that the video should not have been admitted because "the conditions of the demonstration were not substantially identical to those existing at the time of the incident," including Alfaro's lack of familiarity with the pole saw.  Doc. No. 35-14 at 54–56.  Carr claims appellate counsel should have also raised the issues of the need to prime the pole saw before starting it and Alfaro's inexperience with pole saws and chainsaws.  Doc. No. 30 at 31–32.  In addressing the admission of the video, the California Court of Appeal concluded it was properly admitted, stating as follows:

> Here, we conclude the court properly exercised its broad discretion when it ruled to admit the video of the investigator attempting to start the pole saw.  As we noted, the primary issue in this case is whether Carr killed Craig in self-defense, as he argued, based on his story that Craig picked up the pole saw and not only pointed the blade at Carr as he approached, but, accordingly to defendant's testimony, *also* attempted to *start* the pole saw ostensibly to make the weapon even more effective.  In addition, Carr testified that he saw Craig using the pole saw a few weeks before the homicide.  Carr therefore knew the pole saw was operational.  The video of the investigator attempting to start the pole saw, and the difficulty the investigator encountered in finally doing so, was thus highly probative on the self-defense issue.

> In addition, the video was relevant to allow the jury to hear the noise the pole saw made when it was in fact started, as the record shows the video captured the sound of the pole saw from various reference points.  Although the defense argued it did not intend on arguing the pole saw was ever started by Craig on the night of the homicide, the record shows there was conflicting evidence on this issue:  the paramedic who was with Carr after the homicide testified Carr could not remember whether Craig had succeeded in starting the pole saw because Carr was full of adrenaline.  Inasmuch as multiple witnesses testified that, while in the main house, they never heard the sound of the pole saw coming from the garage on the night of the homicide, we conclude the court properly exercised its broad discretion when it ruled to admit the video in order to allow the jury the opportunity to hear the noise it made both when someone was attempting to start it and when it was actually operating.

> Moreover, we conclude the investigator's attempt to start the pole saw was under " ' "substantially similar, although not necessary absolutely

identical, conditions" ' " (see *Rivera*, *supra*, 201 Cal.App.4th at p. 363) to those on the night of the homicide, when Craig allegedly tried to start the weapon.  In both cases the pole saw had not been used for days at a time; in both cases the individuals made multiple attempts to start the pole saw while it was cold; and in both cases the pole saw was in the same, or nearly the same, condition, except that the investigator, who had no familiarity with the saw, broke a plastic piece off the starting mechanism that otherwise did not affect the saw's operation.  We thus reject this claim of error.

Doc. No. 35-17 at 44–45.

The state appellate court gave serious and thorough consideration to appellate counsel's argument that the pole saw video should not have been admitted because it did not properly represent the conditions under which Craig would have operated the pole saw, including whether the pole saw needed to be primed ("in both cases the individuals made multiple attempts to start the pole saw while it was cold").  *Id.*  Carr has not shown that additional argument would have enabled him to prevail on appeal.  *Smith*, 528 U.S. at 285–86.  Accordingly, he has not shown the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law, nor has he established the state court's decision was based on an unreasonable determination of the facts.  *Bell*, 535 U.S. at 694; 28 U.S.C. § 2254(d)(2).

3.  <u>Failure to Preserve Exculpatory Evidence (Ground Two)</u>

Carr claims in Ground Two that the prosecution failed to turn over and preserve exculpatory evidence, namely, the privacy screen with a possible bullet hole.  Doc. No. 30 at 47–51.  As this Court has already noted, the controlling law for Carr's claim is *Trombetta* and *Youngblood* and not *Brady*.  *See* IV(B)(1) at pg. 21–22.

Carr raised this claim in the Petition for Review he filed in the California Supreme Court.  Doc. No. 35-33.  The California Supreme Court summarily denied the petition.  Doc. No. 35-34.  Accordingly, this Court must "look through" to the last reasoned state

/ / /

/ / /

/ / /

court opinion addressing the claim, which is the state appellate court's opinion denying Carr's habeas corpus petition.  *Ylst*, 501 U.S. at 805–06.  That court wrote:

> In a separate claim, Carr contends that the detectives investigating the murder scene failed to preserve evidence in the form of a "privacy screen" that had a bullet hole in it.  Carr suggests that the screen was later thrown away by the victim's family.  He suggests that analysis of this bullet hole's location may have supported his claim that he fired his gun in self-defense.  Carr frames this alleged error alternatively under either *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), which discusses the prosecution's obligation to provide exculpatory evidence to the defense, or *California v. Trombetta* (1984) 467 U.S. 479, which concerns the prosecution's obligation to preserve evidence.  Under either theory, the prosecution's "failure to retain evidence violates due process only when that evidence 'might be expected to play a significant role in the suspect's defense,' and has 'exculpatory value [that is] apparent before [it is] destroyed.'  [Citation.]  In that regard, the mere 'possibility' that information in the prosecution's possession may ultimately prove exculpatory 'is not enough to satisfy the standard of constitutional materiality.'  [Citation.]  And whereas under *Brady* [], the good or bad faith of the prosecution is irrelevant when it fails to disclose to the defendant material exculpatory evidence [citation], a different standard applies when the prosecution fails to retain evidence that is potentially useful to the defense.  In the latter situation, there is no due process violation unless the accused can show bad faith by the government. [Citation.]"  (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8.)  Here, Carr fails to establish that the preservation of the screen would have provided exculpatory evidence and makes nothing more than speculative assertions that the prosecution acted in bad faith.  Without additional evidence, mere speculation does not warrant habeas corpus relief.

Doc. No. 35-32 at 3–4.

The state appellate court appears to have conflated the *Trombetta* and *Youngblood* tests.  The court cited *Trombetta* as the controlling law, which holds that law enforcement has a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense," and that to establish a due process violation, a defendant must show "the evidence . . . possess[ed] an exculpatory value that was apparent before the evidence was destroyed . . . ."  *Trombetta*, 467 U.S. at 488.  But the state court then noted that "when the prosecution fails to retain evidence that is potentially useful to the defense . . .

1   there is no due process violation unless the accused can show bad faith by the

2   government. [Citation.]"  Doc. No. 35-32 at 3–4.  That is the standard the Supreme Court

3   announced in *Youngblood*, which held a defendant must show "bad faith on the part of

4   the police" when the claim is that law enforcement failed "to preserve evidentiary

5   material of which no more can be said than that it could have been subjected to tests, the

6   results of which might have exonerated the defendant."  *Youngblood*, 488 U.S. at 57–58.

7           In any event, even under a *de novo* review, Carr's claim fails under either

8   *Trombetta* or *Youngblood*.  *See Reyes v. Lewis*, 833 F.3d 1001, 1025 (9th Cir. 2016) ("If a

9   'contrary to' error is identified, then 'we must decide the habeas petition by considering

10  *de novo* the constitutional issues raised.'") (quoting *Frantz v. Hazey*, 533 F.3d 724, 735

11  (9th Cir. 2008) (en banc)).  Carr claims the hole in the privacy screen would have helped

12  his claim of self-defense because the screen had a bullet hole in the lower half of the

13  screen, which would have supported his claim that he discharged his second shot at a

14  downward angle intending to stop Craig from advancing.  Doc. No. 30 at 50.  And, he

15  contends the lack of a bullet hole in the top of the screen would have supported his claim

16  that the first shot he fired at Craig's shoulder missed him.  *Id.*

17          First, there is no proof the hole in the screen was actually from a bullet.  Bloch

18  testified she saw *what she believed to be* a bullet hole in the screen.  Doc. No. 35-9 at 29.

19  Further examination would have been required to determine whether it was in fact a

20  bullet hole.  Second, as discussed in Section IV(B)(1) above, even if, as Carr contends,

21  the screen showed his first shot missed Craig and the second shot was in a downward

22  direction, it still would not have been "apparently exculpatory" with respect to the central

23  issue in contention – whether Craig assaulted Carr with the pole saw before Carr shot him

24  in self-defense.  *Trombetta* 467 U.S. at 488.  At most, the screen may have provided

25  evidentiary support for Carr's account regarding how many shots he fired and in which

26  direction.  And, if Carr's argument is that he would have been able to gain exculpatory

27  evidence if he had been able to have the screen examined by an expert, he must therefore

28  satisfy *Youngblood*'s requirement that he show bad faith on the part of law enforcement.

*Youngblood*, 488 U.S at 58.  He has provided no evidence establishing such bad faith.
And, as Detective Bloch testified, had she been aware of the bullet hole she would have
preserved the screen as evidence.  Doc. No. 35-9 at 30.  Carr is therefore not entitled to
relief as to this claim.  *Trombetta*, 467 U.S. at 488; *Youngblood*, 488 U.S. at 57–58.

### 4. Prosecutorial Misconduct

In Ground Three, Carr claims the prosecutor committed misconduct by presenting
perjured testimony, improperly attacking Carr's character, vouching for prosecution
witnesses, using an improper courtroom demonstration, and inflaming the passions of the
jury during closing argument.  Doc. No. 30 at 52–67.  Carr raised these claims in the
habeas corpus petition he filed in the California Supreme Court.  *See* Doc. No. 35-33 at
50–65.  The California Supreme Court summarily denied the petition.  Doc. No. 35-34.
Carr did not raise his prosecutorial misconduct claims in the habeas corpus petition he
filed in the California Court of Appeal, so there is no reasoned decision to which this
Court can defer.  *See* Doc. No. 35-11.  This Court must therefore conduct an independent
review of the record to determine whether the state court's denial of these claims was
contrary to, or an unreasonable application of, clearly established Supreme Court law.
*Himes*, 336 F.3d at 853.

Carr's first claim of prosecutorial misconduct is the alleged use of perjured
testimony.  Doc. No. 30 at 52–57.  He contends the prosecutor introduced false evidence
by telling the jury photos of damage to Carr's vehicle, which Carr suggested was caused
by Maria, did not exist and that Carr was lying, despite the fact that the prosecutor
himself had photos of the damage.  *Id.*

False evidence claims are governed by *Napue v. Illinois*, 360 U.S. 264 (1959).  "A
claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false,
(2) the prosecution knew or should have known that the testimony was actually false, and
(3) the false testimony was material.'"  *Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir.
2016) (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008) and *Hayes v.
Brown*, 399 F.3d 972, 984 (9th Cir. 2005)).  If there is "any reasonable likelihood that the

false testimony could have affected the judgment of the jury" the conviction must be set aside. *Jackson*, 513 F.3d at 1076 (quoting *Hayes*, 399 F.3d at 985).

The prosecutor here did not present false evidence. Carr claimed at trial that about two weeks before the shooting, he parked his car in front of a dumpster on the Hodson property in order to check the car's fluids. Doc. No. 35-11 at 67. While Carr was at his cabin getting supplies, he heard a loud bang, ran out to see what the noise was, and saw Maria placing a note on his car's windshield. *Id.* When Carr looked at the note, he became upset, crumpled up the note, and threw it at Maria's car as she drove off. *Id.* Carr testified he then parked his car in front of his cabin and noticed a large dent in his passenger door. *Id.* at 117. When the prosecutor asked Carr whether he thought Maria had made the dent, he replied, "As I mentioned, I heard a loud bang at first. I really didn't know what it was. That's why I kind of ran out to see what's going on." *Id.* at 118. The prosecutor asked Carr if he took photos of the damage to his car and whether he had those photos. *Id.* Carr replied that he gave the photos to his attorney "and we decided not to deal with that issue." *Id.* Thus, contrary to Carr's characterization of the prosecutor's comments, the prosecutor did not suggest to the jury that the photographs of the damage to Carr's vehicle did not exist or call Carr a liar when he claimed his car had been damaged. *Id.* at 117–18.

Further, the allegedly false evidence was not material. *Reis-Campos*, 832 F.3d at 976. Carr's credibility and evidence of Carr's and Craig's disposition, motives, and actions, as well as the history of the relationship between the two men, was the focus of this case. The jury was called upon to decide what happened between Carr and Craig inside the garage. Whether Maria damaged Carr's vehicle two weeks before the shooting was a peripheral issue. There is no "reasonable likelihood that the [allegedly] false testimony could have affected the judgment of the jury." *See Jackson*, 513 F.3d at 1076.

Carr alleges the prosecutor introduced false evidence by telling the jury that the move-out list found in his cabin was the move-out list Craig left on his porch the night of the shooting. Doc. No. 30 at 55–57. In order to show Carr did not act in self-defense, the

prosecution contended Carr picked up the move-out list Craig left on his doorstep and put it on his dining table inside his cabin.  He then grabbed his gun and went to the garage to confront Craig.  Doc. No. 35-12 at 67–69.  In support of this theory, Maria testified that Carr and Craig exchanged a series of texts the day of the shooting.  Doc. No. 35-6 at 82–86.  In one of the last texts, Carr reminded Craig that he had shampooed the carpets when he moved in, to which Craig responded, "But never mind the carpet, just vacuum it."  *Id.* at 86.  Maria then created a new move-out list, identified in the record as Exhibit 7, for Craig to provide Carr .  *Id.* at 87–88, 92.  The new move-out list was stapled to the move-out list given to Carr when he moved in.  *Id.* at 87–88, 92, 95–98.  Craig took this two-page document and dropped it off on Carr's porch just before the shooting.  *Id.* According to Carr, the night of the shooting, he saw the motion detector light outside his cabin go off, grabbed his gun, and opened the door to his cabin.  Doc. No. 35-11 at 85–87.  He saw a folded piece of paper on his porch and noticed Craig was inside the garage.  *Id.*  When Carr read the piece of paper, he realized it was the wrong move-out list.  *Id.* at 88–92.  Carr put the move-out list back on his porch and went to the garage to discuss the matter with Craig.  *Id.* at 92–93.  The list Carr allegedly left on the porch was never found.  Doc. No. 35-11 at 146.  Carr contended the list found in his cabin was his list, not the one dropped off by Craig.  *Id.* at 143–44.

During cross-examination of Carr, the prosecutor pointed out the inconsistencies in Carr's claims about the move-out list by confronting Carr with the fact that the list Maria created on October 16 was the same list as the one found in Carr's cabin:

> [THE PROSECUTOR]: I want you to turn to Court's Exhibit 79 and 80.

> [CARR]: Yes.

> Q: So Court's Exhibit 79 first, this is the folded up paper that was found on your dining room table; correct?

> A: Yes.

Q: And you had mentioned that when you first looked at it and saw the note on your porch, it was a folded up piece of paper; correct?

A: Uh-huh, yes.

Q: Similar to how this one is folded up?

A: I don't know the same, but yes, it was a folded copy, yes.  And you couldn't read anything from the outside.

Q: And you'll notice the first page of Court's Exhibit 79, this doesn't – this isn't a page that has any edits on it, or anything like that; correct?

A: No, it does have an edit on it.

Q: In fact, this was the document that Maria Hodson testified that she created on October 16th, 2015; isn't that correct?

A: I'm not remembering that.  I don't know if that's what she said or not.  It could – you mean the copy that was on my table?

Q: Correct.

A: That's not the copy Maria made, if that's what you're saying.

Q: Ok.  But do you remember that Maria talked about how there was conversations with her husband about moving out, so she prepared a separate document, one that hadn't been created before, to deliver to you; correct?

A: Yeah, I heard that she said she made copies, if that's what you're saying.

Q: She talked about creating a new document; correct?

A: I thought she said she just made copies.  I don't know anything about a new document.

Q: So if Maria Hodson had created this document on October 16th, there would be no way that it would be in your cabin prior to that; correct?

A: That's not the document that they left.  That was in my file copy.  That's my copy.

Q: But if Maria Hodson had created that first page on October 16th, there was no way you would have had a copy of it before; correct?

A: That's the copy that I made three years earlier upon moving that was on my table.  Both pages are my copy.

. . . .

Q: [discussing Exhibit 79] So you're saying that this is the note that you had all along; correct?

A: Yes, that's my working copy, yes.

Q: Do you notice any cross outs to this note?

A: Yes.

Q: Okay.  And is "and steam clean the carpets" crossed out?

A: I believe Craig made that notation before he went to Mexico, yes.

Q: Did he make that before he went to Mexico or right after you talk[ed] about steam cleaning the carpets to him on October 16th, about Leslie's carpets?

A: This – he notated on the front, and I didn't see exactly what he was doing, and I flipped to the main body of the paperwork.

Q: You talked about – talked to Craig Hodson through text message on October 16th that you weren't responsible for steam cleaning, and he replied, "Fine, just vacuum it."  Correct?

A: Yes.

Doc. No. 35-11 at 143–44.

The prosecutor did not present false evidence by cross-examining Carr about the inconsistencies in his testimony regarding the move-out lists.  Conflicting testimony is not the same as false testimony.  *See United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) (witness's conflicting versions of events does not equate to false testimony).  The

prosecutor here presented the prosecution's version of events, which conflicted with Carr's version. It was the jury's job to determine which version of events to believe, which they resolved to Carr's detriment.

Next, Carr faults the prosecutor for launching "ad hominem" attacks on him by "denigrat[ing] his physical disabilities and medical conditions." Doc. No. 57–61. Specifically, he points to the prosecutor's opening argument, at which he stated:

> And you see him today in a wheelchair, an oxygen tank hooked up to him, but on October 16th, and the preceding weeks before that, the defendant was never in a wheelchair, never owned a wheelchair. The defendant didn't use crutches, the defendant didn't use a cane. The defendant was perfectly capable of getting from place to place on his own two feet. Every incident that occurred in this case was the defendant using his own two feet to get where he needed to be.

> Same thing with the oxygen tank. Never used the oxygen tank on a permanent basis throughout the events in this case. October 1st, October 16th, the defendant was walking in on his own two feet not using an oxygen tank.

Doc. No. 35-6 at 21.

In order to find a prosecutor's actions amount to misconduct, "[i]t is not enough that the prosecutor's remarks [or actions] were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, a prosecutor commits misconduct when his or her actions "'so infect . . . the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id*. (quoting *Donnelly*, 416 U.S. at 642). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

/ / /

The prosecutor's statements were not misconduct, nor were they attacks on Carr's disabilities.  The purpose of opening statements "is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole."  *See United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, J., concurring).  Here, the prosecutor accurately previewed the evidence he planned to present at trial.  Maria testified that she never saw Carr using a wheelchair, crutches, or any other type of walking aid and saw him quickly walking unaided from the garage to his cabin on the night of the shooting.  Doc. No. 35-6 at 112.  Christian Hodson also testified that he never saw Carr use any type of walking aid and described him as "pretty mobile."  *Id.* 153.  Cade Bailey, a former propane customer of Craig's, testified he never saw Carr in a wheelchair or with a cane or an oxygen tank.  Doc. No. 35-7 at 67.

Further, even if the comments were misconduct, they did not "'so infect . . . the trial with unfairness as to make the resulting conviction a denial of due process'" because other evidence was presented which supported Carr's claims of disability.  *Darden*, 477 U.S. at 181.  Sheriff's Deputy Pisia, who was first on the scene of the shooting, testified that Carr came out of his cabin using a cane.  Doc. No. 35-7 at 126–27.  Carr presented the testimony of Dr. Reddy, his physician, testified that he saw Carr for an appointment on October 3, 2016.  Doc. No. 35-10 at 9–10.  Reddy testified that Carr suffered from a cartilage tear in his knee, degenerative disc disease in his neck and back which required pain medication, and chronic obstructive pulmonary disease ("COPD") for which the doctor had prescribed oxygen.  *Id.* at 10–14.  He also testified that Carr walked into his appointments and did not use a cane.  *Id.* at 15.  And Carr himself testified about his medical issues.  Doc. No. 35-11 at 19–25.  Thus, the jury was well aware of Carr's medical conditions and his physical limitations.  Moreover, the jury was instructed that statements made by attorneys during argument were not evidence, that they were to base their verdict solely on the evidence presented to them, and they were not to allow "bias, sympathy, prejudice, or public opinion" to affect their verdict.  Doc. No. 35-1 at 123.

Juries are presumed to follow the instructions they are given.  *Weeks v. Angelone*, 528 U.S. 225, 235 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Carr next contends the prosecutor committed misconduct by improperly vouching for the credibility of witnesses when he stated during closing argument that the Hodson family and other prosecution witnesses had no motive to lie.  Doc. No. 30 at 61–62.  "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony."  *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).  "Improper vouching typically occurs in two situations: (1) the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports the witness's testimony."  *United States v. Brooks*, 508 F.3d 1205, 1209 (9th Cir. 2007) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002)).  Prosecutors are afforded "reasonably wide latitude," however, during argument and may argue reasonable inferences that can be drawn from the evidence presented.  *United States v. Necoechea*, 986 F.3d 1273, 1276 (9th Cir. 1993).

Here, Cass Hodson, DeAnne Hodson, Josephine Silberman, and Earlene Giordano all testified that Carr made threatening and disparaging remarks about Maria to them.  Doc. No. 35-7 at 79–80, 90, 106–07, 112–13.  Cade Bailey testified he witnessed the confrontation between Carr and Craig at the street fair and said Carr was "yelling and screaming" at Craig, and told Craig to "put a muzzle on his wife."  Doc. No. 35-7 at 64–66.  Christian testified he heard Carr say, "You're not so tough now" as he walked away from the garage after shooting Craig.  Doc. No. 35-6 at 164.  Carr denied making all of these statements.  Doc. No. 35-11 at 120–21.  The prosecutor was permitted to comment on Carr's denial by asking why any and all of those witnesses would lie.  *See United States v. Nash*, 115 F.3d 1431, 1439 (9th Cir. 1997) (stating that "inferences from evidence in the record" do not constitute vouching); *Necoechea*, 986 F.3d at 1279–80

(prosecutor's statement "Why, ladies and gentlemen, if [Gibson's] lying, isn't she doing a better job of it? I submit to you, ladies and gentlemen, that she's not lying. I submit to you that she's telling the truth" was not vouching but rather permissible inference from the evidence).

The final two instances of prosecutorial misconduct Carr alleges are the prosecutor's demonstration of the length of time it took Carr to call 911 and his references to the fact that Craig's daughter would never be able to have ice cream with her father again during closing argument. Doc. No. 30 at 62–67. Carr argues the time demonstration was improper because it did not replicate the circumstances under which the original events took place, and the prosecutor's reference to ice cream was improper because it was designed to inflame the passions of the jury. *Id.* These comments were permissible inferences from the evidence presented at trial. Detective Bloch testified that three minutes elapsed between Maria's call to 911 and Carr's call to 911. Doc. No. 35-9 at 24–25. Maria testified that her 11-year-old daughter Caylee had a nightly ritual of eating ice cream with her father Craig while they watched television. Doc. No. 35-6 at 96. The night of the shooting, Caylee had typed a letter to Craig about eating ice cream that evening. *Id.* at 96–97. The prosecutor's references to this evidence were well within the appropriate bounds of closing argument. "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir. 1996).

Moreover, any error in the prosecutor's remarks did not rise to the level of a due process violation by rendering the trial fundamentally unfair. *Darden*, 477 U.S. at 181. As the Court has noted, the jury was instructed that statements made during closing argument were not evidence, that they were to base their verdict solely on the evidence presented to them, and they were not to allow "bias, sympathy, prejudice, or public opinion" to affect their verdict. Doc. No. 35-1 at 123. Juries are presumed to follow the instructions they are given. *Weeks*, 528 U.S. at 235.

The state court's denial of Carr's prosecutorial misconduct claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).  Carr is therefore not entitled to relief as to those claims.  *Himes*, 336 F.3d at 853.

5. Daubert Error

Finally, Carr claims the state court improperly admitted both the prosecutor's "passage of time" demonstration and the video of D.A. Investigator Alfaro attempting to start the pole saw under the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Doc. No. 30 at 67–70.  As an initial matter, the "passage of time" demonstration was not admitted as evidence but rather was part of the prosecution's argument.  Doc. No. 35-12 at 63.  As such, any legal parameters surrounding the admission of scientific, expert, or demonstrative testimony do not apply.  Further, *Daubert* interpreted the Federal Rules of Evidence and set standards for admitting expert scientific testimony in a federal trial; it was not based on the United States Constitution. *Id.* at 582.  "For that reason, California courts are not required to apply [*Daubert*], and in fact do not.  *Hill v. Virga*, No. C 11-4793 YGR (PR), 2013 WL 321843, at *12 (N.D. Cal. Jan. 28, 2013) (citing *People v. Leahy*, 8 Cal. 4th 587, 594 (1994)).  State rules of evidence govern state trials, and thus claims regarding the admission of evidence under state law are not cognizable on federal habeas corpus review.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding that federal habeas relief is not available for alleged violations of state law); see also 28 U.S.C. § 2254(a).

Carr has also not established his federal due process rights were violated by the admission of the pole saw video.  As the Ninth Circuit has noted:

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d).  In cases where the Supreme Court has not adequately addressed a claim, this court cannot use

its own precedent to find a state court ruling unreasonable.  [*Carey v.*] *Musladin*, 549 U.S. at 77, 127 S.Ct. 649.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, *see Williams*, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.  Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application."  *Musladin*, 549 U.S. at 77, 127 S.Ct. 649.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

The reasoning of *Holley* applies to Carr's case.  Accordingly, the Court concludes he is not entitled to relief as to this claim.  *Bell*, 535 U.S. at 694.

## V.  CONCLUSION

For the foregoing reasons, the Petition is **DENIED**.  Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254 (West 2019).  A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (West 2019); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Beaty v. Stewart*, 303 F.3d 975, 984 (9th

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here, the Court concludes Carr has not made the required showing, and therefore a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 4, 2024

_____

HON. MICHAEL M. ANELLO
United States District Judge

21-cv-0900-MMA (MMP)